**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

_____

| | |
|---|---|
| **RACING HEAD SERVICE, LLC, and** | ) |
| **COMPETITION CAMS, INC.,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | )       **No. 09-2604-STA-tmp** |
| | ) |
| **MALLORY ALEXANDER** | ) |
| **INTERNATIONAL LOGISTICS, LLC;** | ) |
| **JALAR TRANSPORTATION, INC.;** | ) |
| **HARRINGTON TRUCKING, LLC; and** | ) |
| **JOHN DOES 1 THROUGH 10,** | ) |
| | ) |
| **Defendants.** | ) |

_____

**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND**
**GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO**
**DISREGARD AFFIDAVIT TESTIMONY**

_____

Before the Court is Defendant Mallory Alexander International Logistics, LLC's

("Defendant") Motion for Summary Judgment (D.E. # 38), filed on April 11, 2011.  Plaintiffs

filed a Response to Defendant's Motion (D.E. # 56) on May 23, 2011.  Defendant then filed a

Reply to Plaintiffs' Response (D.E. # 61) on June 14, 2011.  Plaintiffs also filed a Motion to

Disregard Affidavit Testimony in Support of Defendant's Motion for Summary Judgment (D.E.

# 57) on May 23, 2011.  For the following reasons, Defendant's Motion for Summary Judgment

is **DENIED**, and Plaintiffs' Motion to Disregard Affidavit Testimony is **GRANTED IN PART AND DENIED IN PART**.[1]

## BACKGROUND

Plaintiffs filed a Complaint on September 11, 2009, suing four parties: Jalar Transportation, Inc.; Harrington Transportation, Inc. ("Harrington Transportation"); Mallory Alexander International Logistics, LLC; and John Does 1-10.  (D.E. # 1.)  Summons was returned executed as to Harrington Transportation on November 9, 2009.  (D.E. # 8.)  Plaintiffs then filed an Amended Complaint that same day, alleging four counts of liability as to Defendant only: Defendant's liability as a freight forwarder, carrier, or non-vessel operating common carrier; negligence; a violation of the Tennessee Consumer Protection Act ("TCPA"); and promissory estoppel and detrimental reliance.  (D.E. # 9.)  The Amended Complaint also contained a fifth count of allegations against three other defendants, all of which were the same defendants named in the original Complaint except one:  Harrington Trucking, LLC ("Harrington Trucking").  (*Id.*)  Therefore, Harrington Transportation was no longer a party to this case after the filing of the Amended Complaint.  While summons was issued as to Harrington Trucking on November 9, 2009, Harrington Trucking was terminated as a party that same day.  Additionally, Plaintiffs have not substituted any named parties for defendants John Doe 1 through 10.

On November 10, 2009, Defendant filed an Answer to Plaintiffs' Amended Complaint as well as cross-claims against its co-defendants.  (D.E. # 11.)  One of these defendants, Jalar

---

[1]     The Court will address Plaintiffs' Motion to Disregard Affidavit Testimony in relevant portions of the Background section of its opinion.

Transportation, Inc. ("Jalar"), filed a Motion to Dismiss Defendant's Cross-Complaint (D.E. #

18) on April 6, 2010.  On July 29, 2010, the Court entered a Consent Order granting in part and

denying in part Jalar's Motion to Dismiss the Cross-Complaint.  (D.E. # 24.)  Additionally, on

April 19, 2011, the parties filed a Stipulation Concerning Jalar (D.E. # 52) fully dismissing Jalar

from the suit.  The stipulation is as follows:

> Dismissed Defendant [Jalar] arrived at the Packer Avenue Terminal at the Port of
> Philadelphia on September 17, 2007, with instructions to transport a portion of a
> milling machine loaded on a 40' flat rack identified as AMZU4152670.  The other
> portion of the milling machine was loaded in a 20' open top container identified as
> TOLU4607606 and was not transported by Jalar.  Both loads are the subject of
> this litigation.  The parties agree that Jalar did not cause directly or indirectly any
> damage to any part of the milling machine at any time.

(D.E. # 52 at 1.)  Thus, the only remaining parties to this case are Plaintiffs and Defendant.  The

following facts are undisputed unless otherwise noted.

This case arises from damage to a custom-built Okuma MA-60 Horizontal Machining

Center and related equipment ("the Equipment") during transportation provided or arranged for

by Defendant from Auckland, New Zealand, to Plaintiffs' customer, Royal Oak Boring ("Royal

Oak"), in Lake Orion, Michigan.  (Compl. ¶ 9.)  Royal Oak intended to use the Equipment to

manufacture parts for Plaintiffs.  (Pls.' Statement of Additional Material Facts, D.E. # 56-1, at

27.)  Plaintiffs normally use FedEx Trade Networks ("FedEx") in their overseas shipments, and

Plaintiffs also expected that FedEx would handle the domestic portion of the shipment of the

Equipment.  (*Id.* at 28.)  It is undisputed that Plaintiffs hired Lucas Machinery ("Lucas") to

prepare, decommission, and prepare the Equipment for shipping to the United States.  (*Id.* at 19.)

In turn, Lucas hired Pengelly's to organize the overseas shipment.  (*Id.*)

However, Defendant was contacted to clear the Equipment through customs upon its arrival in the Port of Philadelphia. (*Id.* at 28.) After the Equipment cleared customs, Defendant received a release from the ocean carrier, which instructed Defendant to contact Royal Oak. (*Id.*) Defendant then agreed to transport the Equipment for Plaintiffs and began working with various entities at the Port of Philadelphia to remove the Equipment from storage and prepare it for transportation. (*Id.*) Defendant disputes this fact in part because it agreed with Royal Oak to make arrangements for the transport of the Equipment for the benefit of Plaintiffs. (Def.'s Response to Pls.' Statement of Additional Material Facts, D.E. # 62, at 1 (emphasis omitted).)

The Equipment was shipped in two pieces: TOLU-4607606 and AMZU-4152670. (Pls.' Statement of Additional Material Facts, D.E. # 56-1, at 28.) Throughout the transportation process, which one of Defendant's employees described as a "nightmare," several problems occurred. (*Id.*) One of the pieces was too heavy for the carrier hired by Defendant to transport, and the other was too tall to meet highway height restrictions. (*Id.*) These issues required Defendant to hire additional entities to transport the Equipment. (*Id.*) The parties do not dispute that, when the Equipment ultimately arrived at Royal Oak, it was severely damaged. (*Id.*) During the pendency of this lawsuit, Plaintiffs have paid to store the Equipment. (*Id.*)

Additionally, it is undisputed that the portion of the Equipment labeled as AMZU-4152670 was allegedly damaged while being offloaded from the shipping vessel at the Port of Philadelphia. (Pls.' Resp. to Def.'s Statement of Undisputed Material Facts, D.E. # 56-1, at 21.) It is also undisputed that Plaintiffs are unaware of whether the cargo was damaged prior to being offloaded from the ocean vessel. (*Id.*) Plaintiffs could not tell that either portion of the Equipment was damaged beyond repair by visual inspection. (*Id.*) While Defendant submits

4

that Plaintiffs were unaware of whether Defendant was responsible for retaining the company which offloaded the Equipment at the Port of Philadelphia, Plaintiffs aver that Defendant's statements demonstrate that Defendant retained the company responsible for offloading the Equipment. (*Id.*) Regardless, it is undisputed that the Equipment did not safely reach Michigan without sustaining damage. (*Id.* at 22.)

### The Relationship between Defendant and Royal Oak

Royal Oak retained Defendant to perform customs brokerage and arrange on-forwarding services. (Pls.' Resp. to Def.'s Statement of Undisputed Material Facts, D.E. # 56-1, at 7.) Defendant submits that it did not act or agree to act as a carrier and that it did not agree to undertake responsibility for the safe transportation of the Equipment or to consolidate the Equipment with the goods of another customer. (*Id.*) Nor did Defendant consolidate the Equipment, transport the Equipment, or possess the Equipment. (*Id.*) Additionally, Defendant did not take physical possession of the Equipment or issue a bill of lading. (*Id.*) Instead, Defendant retained the services of several logistics providers to act on Royal Oak's behalf for Plaintiffs' benefit. (*Id.*)

Plaintiffs dispute these assertions because Defendant expressly admitted to acting as a freight forwarder in the shipment of the Equipment. (*Id.*) Additionally, at her deposition, LaVigne testified that she did not know what a freight forwarder is, and Plaintiffs submit that her affidavit testimony as to Defendant's status as a freight forwarder should be disregarded.[2] (*Id.*)

---

[2]     In their Motion to Disregard Affidavit Testimony, Plaintiffs object to the presentation of this testimony because LaVigne did not know the meaning of the term of art "freight forwarder" during her testimony at the deposition. (Mot. to Disregard Aff. Test., D.E. # 57, at 7-8.) Plaintiffs request the Court not to consider this testimony to the extent that it purports to state that Defendant does not fall within the freight forwarder definition under the

Plaintiffs also reiterate that none of Defendant's actions regarding the Equipment were subject to any written terms and conditions.  (*Id.*)  Additionally, Plaintiffs argue that Defendant acted as a carrier by agreeing to transport the Equipment from Philadelphia to Michigan, receiving and controlling the Equipment, and hiring other carriers to transport the Equipment.  (*Id.* at 7-8.)  In reply, Defendant avers that Plaintiffs have made an improper legal argument and that an ocean freight forwarder and a Carmack freight forwarder are two separate and distinct entities.  (Def.'s Reply to Pls.' Resp., D.E. # 62, at 8.)

Defendant states that the established course of dealing between it and Royal Oak when Defendant was an ocean freight forwarder involved in the entire international transportation chain entailed Defendant procuring separate insurance under an open cargo policy for Royal Oak.  (Pls.' Resp. to Def.'s Statement of Undisputed Material Facts, D.E. # 56-1, at 8-9.)  When Defendant was not involved in the international transportation chain and merely performed customs clearance and arranged over-the-road delivery, the course of dealing between Defendant and Royal Oak included Defendant not procuring insurance on Royal Oak's behalf.  (*Id.* at 9.)  Defendant submits that under this course of dealing, it was not obligated to procure insurance for the shipment of the Equipment and was not requested to do so.  (*Id.*)  Plaintiffs dispute these facts because of LaVigne's testimony about Defendant's actions as a freight forwarder despite her lack of knowledge of the definition of freight forwarder.[3]  (*Id.*)  In reply, Defendant asserts

---

Carmack Amendment.  (*Id.*)  As Court finds this objection to be well-taken, Plaintiffs' Motion in this regard is **GRANTED**, and the Court's reliance on LaVigne's testimony in this regard will be restricted as requested by Plaintiffs.

[3]        In their Motion to Disregard Affidavit Testimony, Plaintiffs again object to the presentation of this testimony for the same reason raised previously:  they argue that LaVigne did not know the meaning of the term of art "freight forwarder" during her testimony at

Plaintiffs make an improper legal argument regarding the definition of a freight forwarder. (Def.'s Reply to Pls.' Resp., D.E. # 62, at 8.)

### The Relationship between Plaintiffs and Defendant

It is undisputed that Plaintiffs did not hire Defendant.  (Pls.' Resp. to Def.'s Statement of Undisputed Material Facts, D.E. # 56-1, at 20.)  While it is undisputed that Plaintiffs did not object to the retention of Defendant by the companies that hired Defendant, Plaintiffs further submit that they did not object because when they tried to have FedEx take control of the Equipment's shipment, they were unable to do so because Defendant was already in control of the shipment.  (*Id.*)  Defendant states that when Plaintiffs became aware of Defendant's control of the shipment, Defendant had already arranged the Equipment's delivery.  (*Id.*)  Plaintiffs dispute this fact because the majority of the transportation arrangements had not already been made.  (*Id.*)

### The Power of Attorney, Invoices, and Terms and Conditions

Defendant and Royal Oak have conducted business since July of 2003.  (Pls.' Resp. to Def.'s Statement of Undisputed Material Facts, D.E. # 56-1, at 2.)  At the start of their business relationship, Royal Oak executed a power of attorney in favor of Defendant.  (*Id.*)  The power of attorney specifically incorporates terms and conditions of service as adopted and promulgated by the National Customs Brokers and Freight Forwarders Association of America ("NCBFAA"), of which Defendant is a member.  (*Id.*)  Additionally, the power of attorney expressly provides that Royal Oak acknowledges that it received a copy of the applicable terms and conditions.  (*Id.*)

---

the deposition.  (Mot. to Disregard Aff. Test., D.E. # 57, at 8-9.)  Because the Court has already granted Plaintiffs' Motion in this regard in Footnote 2, it need not address the same objection an additional time.

There is no record of Royal Oak objecting to the continued use of these terms and conditions. (*Id.* at 6.)  Plaintiffs do not dispute these facts, but they do argue that they are immaterial.  (*Id.* at 2, 6.)

While Defendant performed services for Royal Oak, Defendant supplied Royal Oak with invoices for services rendered.  (*Id.* at 2.)  The invoices contained terms and conditions of service set forth on their reverse sides as adopted and promulgated by the NCBFAA.  (*Id.*)  Plaintiffs dispute these facts as impermissibly contradicted by the affidavit of Ms. Dawn LaVigne ("LaVigne"), who was Defendant's designated representative under Federal Rule of Civil Procedure 30(b)(6) ("Rule 30(b)(6)").  (*Id.* at 1.)  Plaintiffs submit that at her deposition, LaVigne testified that it was her practice to send invoices to customers, including Royal Oak and Plaintiffs, by fax or email, which would not contain the terms and conditions printed on the back of the invoice.  (*Id.* at 2.)  Therefore, Plaintiffs argue that LaVigne's affidavit and deposition testimony directly conflict and that they should not be considered.[4]  (*Id.*)  In reply, Defendant submits that the lack of terms and conditions on the back of invoices is restricted to a reprint of an invoice to Plaintiffs which was not sent to Royal Oak.  (Def.'s Reply to Pls.' Resp., D.E. # 62, at 4.)  It also points out that LaVigne testified that Royal Oak received the terms and conditions on numerous occasions and that the subject of LaVigne's questioning was whether Plaintiffs received the back of the invoice.  (*Id.* at 4-5.)

---

[4]     In their Motion to Disregard Affidavit Testimony, Plaintiffs object to the presentation of this testimony because LaVigne's testimony at her deposition and in her affidavit are directly contradictory.  (Mot. to Disregard Aff. Test., D.E. # 57, at 3, 6-7.)  Plaintiffs request the Court not to consider this testimony.  (*Id.*)  As Court finds this objection to be well-taken, Plaintiffs' Motion in this regard is **GRANTED**, and the Court will disregard LaVigne's statement that "all copies of the invoices include on the reverse side the [Terms and Conditions]."

Defendant submits that its books and records reveal 318 transactions with Royal Oak between 2003 and 2007 predating the transaction at issue in this case.  (Pls.' Resp. to Def.'s Statement of Undisputed Material Facts, D.E. # 56-1, at 3.)  In each of these transactions, the invoices contained terms and conditions of service.  (*Id.*)  The invoices included an original copy, a customer copy received by Royal Oak, a file copy, and a branch accounting copy.  (*Id.*)  All copies of the invoices included the terms and conditions of service on the reverse side.  (*Id.*)  Plaintiffs dispute these facts because they impermissibly contradict LaVigne's deposition testimony: in her deposition, LaVigne testified that she was aware of several containers that Defendant had cleared for customs and on-forwarded to Royal Oak, but she did not mention the alleged 318 transactions described in her affidavit.  (*Id.*)  In reply, Defendant states that LaVigne should not be precluded from identifying the exact number of transactions by affidavit as she testified that there was a consistent relationship between Royal Oak and Defendant for a five year period.[5]  (Def.'s Reply to Pls.' Resp., D.E. # 62, at 5.)

In each of these 318 transactions, Defendant did not agree to or represent that it agreed to assume responsibility for the safe transportation of the equipment, issue a bill of lading covering any of the over-the-road transportation services, consolidate cargo by taking a less-than-full truck load of Royal Oak's merchandise and combining it with that of another customer, or take physical possession of the cargo.  (Pls.' Resp. to Def.'s Statement of Undisputed Material Facts,

---

[5]      In their Motion to Disregard Affidavit Testimony, Plaintiffs object to the presentation of this testimony because LaVigne's testimony at her deposition and in her affidavit are directly contradictory.  (Mot. to Disregard Aff. Test., D.E. # 57, at 3, 8-10.)  Plaintiffs request the Court not to consider this testimony.  (*Id.*)  However, the Court finds that LaVigne's statement that "several transactions" took place at the deposition, which was then made more specific in her affidavit by the notification that there were 318 transactions, was not directly contradicted.  Therefore, Plaintiffs' Motion in this regard is **DENIED.**

D.E. # 56-1, at 10.)  Plaintiffs dispute these facts due to the alleged inconsistency in LaVigne's

deposition testimony regarding the number and nature of prior transactions.  (*Id.*)  In reply,

Defendant states that LaVigne's testimony was consistent and that she testified that there was a

consistent relationship between Royal Oak and Defendant for five years.  (Def.'s Reply to Pls.'

Resp., D.E. # 62, at 5, 8.)

Defendant states that its books and records indicate that all of the invoices tendered to

Royal Oak contained the following terms and conditions of service (the "Terms and

Conditions"):[6]

1.      Definitions

        (a) "Company" shall mean Mallory Alexander International Logistics
LLC, its subsidiaries, related companies, agents and/or representatives;
        (b) "Customer" shall mean the person for which the Company is rendering
service, as well as its agents and/or representatives, including but not limited to
shippers, importers, exporters, colliers, secured parties, warehousemen, buyers
and/or sellers, shippers agents, insurers and underwriters, break-bulk agents,
consignees, etc.  It is the responsibility of the customer to provide notice and
copy(s) of these terms and conditions of service to all such agents and
representatives;

3.      Limitations of Actions

        (a) Unless subject to a specific statute or international convention, all
claims against the Company for a potential or actual loss must be made in writing

---

[6]      In their Motion to Disregard Affidavit Testimony, Plaintiffs object to the
presentation of this testimony based on hearsay and the best evidence rule.  (Mot. to Disregard
Aff. Test., D.E. # 57, at 4-6.)  Plaintiffs request the Court not to consider this testimony.  (*Id.*)
Contrary to Plaintiffs' objections regarding Defendant's alleged failure to "attach or reference
the actual document providing these terms and conditions," a full representative copy of the
Terms and Conditions is available at page 4 of D.E. # 41 as an attachment to Defendant's Motion
for Summary Judgment.  Therefore, the Terms and Conditions have been provided to the Court
in full as part of Defendant's summary judgment motion, and Plaintiffs' Motion objecting to the
Court's reliance on those Terms and Conditions through LaVigne's affidavit testimony is
**DENIED**.

and received by the Company within ninety (90) days of the event giving rise to [the] claim; the failure to give the Company timely notice shall be a complete defense to any suit or action commenced by Customer.

(b) All suits against Company must be timely filed and properly served on Company as follows:

(i) For claims arising out of ocean transportation, within one (1) year from the date of the loss;

(ii) For claims arising out of air transportation, within two (2) years of the loss;

(iii) For claims arising out of the preparation and/or submission of an import entry(s), within seventy-five (75) days from the date of liquidation of the entry(s);

(iv) For any and all other claims of any other type, within two (2) years from the date of the loss of damage.

4.      No Liability for the Selection or Services of Third Parties and/or Routes

Unless services are performed by persons or firms engaged pursuant to express written instructions from the Customer, Company shall use reasonable care in its selection of third parties, or in selecting the means, route, and procedure to be following in the handling, transportation, clearance, and delivery of the shipment; advice by the Company that a particular person or firm has been selected to render services with respect to the goods, shall not be construed to mean that the Company warrants or represents that such person or firm will render such services nor does Company assume responsibility or liability for any actions(s) and/or interaction(s) of such third parties and/or its agents, and shall not be liable for any delay or loss of any kind, which occurs while a shipment is in the custody or control of a third party or the agent of a third party; all claims in connection with the Act of a third party shall be brought solely against such party and/or its agents; in connection with any such claim, the Company shall reasonably cooperate with the Customer, which shall be liable for any charges or costs incurred by the Company.

8.      Insurance

Unless requested to do so in writing and confirmed to Customer in writing, Company is under no obligation to procure insurance on Customer's behalf; in all cases, Customer shall pay all premiums and costs in connection with procuring requested insurance.

9.      Disclaimers; Limitations of Liability

(a) Except as specifically set forth herein, Company makes no express or implied warranties in connection with its services;

11

(b) Subject to (c) below, Customer agrees that in connection with any and all services performed by the Company, the Company shall be liable for its negligent acts, which are the direct and prximate cuase of any injury to Customer, including loss or damage to Customer's goods, and the Company shall in no event be liable for the acts of third parties;

(c) In connection with all services performed by the Company, Customer may obtain additional liability coverage, up to the actual or declared value of the shipment or transaction, by requesting such coverage and agreeing to make payment therefore, which request must be confirmed in writing by the Company prior to rendering services for the covered transaction(s);

(d) In the absence of additional coverage under (b) above; the Company's liability shall be limited to the following:

(i) where the claim arises from activities other than those relating to customs brokerage, $50.00 per shipment or transaction(s);

(ii) where the claim arises from activities relating to "Customs business," $50.00 per entry or the amount of brokerage fees paid to Company for the entry, whichever is less;

(e) In no even shall Company be liable or responsible for consequential, indirect, incidental, statutory or punitive damages even if it has been put on notice of the possibility of such damages.

(Pls.' Resp. to Def.'s Statement of Undisputed Material Facts, D.E. # 56-1, at 3-5.)  Plaintiffs

dispute the materiality of the Terms and Conditions because whether the invoices Defendant

provided to Royal Oak contained the Terms and Conditions is in dispute.  (*Id.* at 5.)  In reply,

Defendant points out that although Plaintiffs dispute whether the invoices contained these terms,

the power of attorney contained them, and it is undisputed that Royal Oak received the Terms

and Conditions and agreed to them.  (Def.'s Reply to Pls.' Resp., D.E. # 62, at 7.)

Under the Terms and Conditions, Defendant's customers have the option of insuring their

product themselves, obtaining insurance through Defendant by proper request, declaring value in

exchange for increased compensation to Defendant, or agreeing to a released value rate of

$50.00 per shipment.  (Pls.' Resp. to Def.'s Statement of Undisputed Material Facts, D.E. # 56-1,

at 5.)  Additionally, the Terms and Conditions state that Defendant would not obtain insurance

for the benefit of its customer unless requested to do so.  (*Id.* at 8.)  Defendant submits that at no

12

time during the business transactions by and between Royal Oak and Defendant did Royal Oak request an increase in the limitation of liability.  (*Id.* at 5.)  Plaintiffs dispute the materiality of the Terms and Conditions because whether the invoices Defendant provided to Royal Oak contained the Terms and Conditions is in dispute.  (*Id.*)  In reply, Defendant points out that although Plaintiffs dispute whether the invoices contained these terms, the power of attorney contained them, and it is undisputed that Royal Oak received the Terms and Conditions and agreed to them.  (Def.'s Reply to Pls.' Resp., D.E. # 62, at 7.)  It is undisputed that Royal Oak did not object to the continued use of the Terms and Conditions.  (Pls.' Resp. to Def.'s Statement of Undisputed Material Facts, D.E. # 56-1, at 6.)

Defendant states that it tendered to Plaintiffs invoices with the terms for the shipment of the Equipment on the reverse side and that Plaintiffs paid those invoices without objection.  (*Id.*)  Plaintiffs dispute these facts.  Plaintiffs submit that LaVigne's deposition testimony directly contradicts these assertions because she testified that the reverse side of the invoices was not provided to Plaintiffs and that the Terms and Conditions are therefore not binding on Plaintiffs.  (*Id.*)  Because Defendant admitted that the invoices it provided to Plaintiffs had no language regarding the Terms and Conditions and could not explain why it provided Plaintiffs with those invoices, Plaintiffs argue that the Defendant's alleged tender of the invoices with the Terms and Conditions should be disregarded.  (*Id.*)  Additionally, Plaintiffs assert that Defendant produced only a representative copy of the Terms and Conditions, and Defendant's counsel indicated that this copy was not the terms and conditions that would have been found on the invoice given to Plaintiffs.  (*Id.*)  Plaintiffs aver that Defendant uses different versions of terms and conditions

depending on the type of services it offers, and Defendant was unable to identify which terms and conditions would have governed the shipment of the Equipment.  (*Id.* at 6-7.)

Defendant asserts that the terms of sale for the Equipment were CFR Philadelphia.  (*Id.* at 13.)  Plaintiffs dispute this fact.  They assert that Defendant's cited reference for this fact is not an invoice signed by either Plaintiffs or Royal Oak and that, therefore, it cannot dictate the terms of the shipment of the Equipment.  (*Id.* at 14.)  Furthermore, the invoice does not reference Plaintiffs.  (*Id.*)  Instead, Plaintiffs submit that the agreement between Plaintiffs and Royal Oak is oral in nature and evidenced by an invoice issued by Plaintiffs to Royal Oak, which does not contain a CFR shipping term.  (*Id.*)

It is undisputed that Defendant's policies and procedures as maintained on its website advise its customers that in the event of damage, insurance claims must be made directly with the freight company.  (*Id.* at 25.)  Defendant submits that all email communications, including those in September of 2007, between Plaintiffs and Defendant contained language stating that "all business including quotations is undertaken subject to our standard terms and conditions" and that Plaintiffs never objected to those terms.  (*Id.*)  Plaintiffs dispute this fact because Defendant produced emails sent by its employees which failed to contain that language.  (*Id.*)

### The Transportation of the Equipment

When arranging transportation of the Equipment with Defendant, Royal Oak requested Defendant to coordinate and arrange the movement of the Equipment through different transportation logistics providers.  (*Id.* at 10.)  Royal Oak also instructed Defendant to send Plaintiffs an invoice and to seek additional information from Plaintiffs to coordinate the movement of the Equipment.  (*Id.*)  Defendant states that, under paragraph 1(b) of the Terms and

14

Conditions, Royal Oak was responsible for providing a copy of the Terms and Conditions to Plaintiffs.[7] (*Id.*)  Additionally, Defendant submits that Royal Oak held itself out as having the authority to retain Defendant to act on Plaintiffs' behalf.  (*Id.*)  Plaintiffs dispute this last statement because it is a legal conclusion and state that it must be disregarded.  (*Id.*)  Furthermore, Plaintiffs dispute these facts because they believe that none of Defendant's actions regarding the Equipment were subject to any written terms and conditions.  (*Id.*)

When Defendant arranged for the transportation of the Equipment from Philadelphia to Michigan, Defendant retained Bridge Terminal Transport ("BTT"), a motor carrier, to handle a portion of the transportation.  (*Id.*)  Defendant also retained Resource Logistics "on behalf of Royal Oak and for [Plaintiffs'] benefit."  (*Id.*)  Defendant approved BTT and Resource Logistics as vendors.  (*Id.*)  BTT maintains a Rules Tariff limits its liability to $100,000.00 per shipment, and this tariff is available online.  (*Id.* at 17.)  Plaintiffs have not commenced a lawsuit against BTT.  (*Id.* at 13.)

Plaintiffs dispute these facts for several reasons.  First, they state that Defendant did not "act on behalf of Royal Oak and for [Plaintiffs'] benefit;" instead, they assert that Plaintiffs, not Royal Oak, paid Defendant.  (*Id.* at 10.)  Plaintiffs also appear to dispute Defendant's characterization of the relationship between Plaintiffs and Royal Oak.  (*Id.*)  Plaintiffs state that Defendant communicated only with them regarding problems with the Equipment's shipment and that those communications were typical of those had with customers.  (*Id.*)  According to

---

[7]        Section 1(b) of the Terms and Conditions provides that "[i]t is the responsibility of the customer to provide notice and copy(s) of these terms and conditions of service to all such agents and representatives."  Thus, Royal Oak would be required to submit the Terms and Conditions to Plaintiffs only if Plaintiffs were its agents or representatives.

Plaintiffs, Defendant followed their directions regarding the Equipment's shipment and did not contact Royal Oak for permission or instructions throughout the Equipment's transportation. (*Id.* at 11.) Additionally, Plaintiffs assert that Royal Oak was not an agent for Plaintiffs in this transaction; instead, Royal Oak was the first entity to contact Defendant, after which Royal Oak directed Defendant to contact Plaintiffs because Royal Oak had no responsibility for the Equipment's transportation. (*Id.*)

Additionally, Defendant retained Holt Logistics, operating through its terminal operator Greenwich Terminals LLC, to be the sole entity authorized to lift and load cargo at the Port of Philadelphia. (*Id.* at 11.) Greenwich Terminals LLC is a division of Holt Logistics, and they are the Marine Terminal Operator of Packer Avenue Marine Terminal in the Port of Philadelphia. (*Id.* at 16.) They maintain a tariff electronically filed with the Federal Maritime Commission, which is also available in public records online: this tariff limits their liability as Terminal Operator to $500.00. (*Id.* at 16-17.) Holt Logistics lifted and loaded the Equipment onto Jalar's vehicles for transportation. (*See id.* at 11.) Defendant received an invoice for Holt Logistics' lifting and loading services, but it did not select Holt Logistics as the lifting and loading entity because customs brokers and logistics providers at the Port of Philadelphia are not given an option with respect to which company to use. (*Id.*)

Plaintiffs dispute these facts because they directly contradict LaVigne's deposition testimony. In her deposition, LaVigne testified that she did not know anything about the relationship between Greenwich Terminals and Holt Logistics.[8] (*Id.* at 12.) However, it is

_____

[8]    In their Motion to Disregard Affidavit Testimony, Plaintiffs object to the presentation of this testimony because LaVigne's deposition testimony that she knew nothing about the relationship between Holt Logistics and Greenwich Terminals directly contradicts her

undisputed that Defendant hired Holt Logistics to perform services, that Defendant provided instruction and authorization to Holt Logistics regarding those services, and that Defendant paid Holt Logistics.[9]  (*Id.* at 12.)  Plaintiffs have not commenced a lawsuit against Holt Logistics.  (*Id.* at 13.)

### Timeline of Events

On August 13, 2007, an Invoice and Combined Certificate of Value and Origin was provided to Plaintiffs' contact at Competition Cams, who then provided it to Defendant.  (*Id.* at 19.)  On approximately August 20, 2007, Defendant was contacted to perform brokerage services after the Equipment had arrived via ocean transportation arrangements handled by YRC.  (*Id.* at 17.)  YRC was involved in the overseas transportation of the Equipment.[10]  (*Id.*)  The Equipment was delivered on September 14, 2007.  (*Id.* at 27.)  Defendant first became involved

---

affidavit testimony.  (Mot. to Disregard Aff. Test., D.E. # 57, at 10-11.)  Plaintiffs request the Court not to consider this testimony.  (*Id.*)  While LaVigne was Defendant's 30(b)(6) representative, her testimony that she did not know about the relationship between Holt Logistics and Greenwich Terminals was not contradicted by her later knowledge.  Indeed, she did not know at her deposition, but she learned about the relationship later, and submitted additional affidavit testimony to the Court.  Therefore, the Court **DENIES** Plaintiffs' Motion in this regard.

[9]  Additionally, the Court notes that it is undisputed that Robert Connor ("Connor"), Defendant's Vice President for Global Transportation, is familiar with the operations of the Port of Philadelphia.  (*Id.* at 11.)  However, Plaintiffs object to Defendant's reliance on his affidavit, alleging that his testimony should not be allowed to contradict that of LaVigne.  Plaintiffs state that Defendant had the obligation to prepare LaVigne with its corporate knowledge, and if it did not do so, it should not now be permitted to present affidavit testimony contradicting the testimony of its designated representative.  Because the Court will not disregard LaVigne's testimony on the relationship between Holt Logistics and Greenwich Terminals, the Court need not address Plaintiffs' objection to Connor's testimony to the same.  (*See* Mot. to Disregard Aff. Test., D.E. # 57, at 11-12.)

[10]  Defendant's lack of involvement in the overseas portion of the Equipment's shipment is undisputed.  (*Id.* at 17.)  Defendant's involvement in the shipment was limited to performing customs brokerage services and arranging the Equipment's transport from the Port of Philadelphia to Michigan.  (*Id.*)

in the shipment of the Equipment about four days after its arrival in Philadelphia.  (*Id.* at 17.)
Sometime during September of 2007, after Defendant had begun transporting the Equipment and
problems had arisen with the transportation, Defendant directed Plaintiffs to its website to make
payment to Defendant.  (*Id.* at 13.)

By October of 2007, once the damage to the Equipment had been ascertained, Defendant
submits that Plaintiffs had been advised that insurance claims would not come from Defendant.
(*Id.* at 14.)  Plaintiffs dispute this fact because on November 9, 2007, LaVigne stated that she
had turned in a claim with BTT.  (*Id.*)  Additionally, Defendant states that as early as October 10,
2007, Plaintiffs were aware that the claims in this case could be time-barred.  (*Id.*)  Plaintiffs
dispute this fact because, as of October 10, 2007, they learned that some of their claims were
already time-barred due to Defendant's withholding of information and deceptive conduct.  (*Id.*)
Additionally, Plaintiffs chose not to bring suit against the entity which unloaded the Equipment
at the Port of Philadelphia because the statute of limitations had already run.  (*Id.* at 27.)

Defendant also avers that Plaintiffs were on notice of BTT's involvement in the
transportation of the Equipment on or before November of 2007.  (*Id.* at 13.)  Plaintiffs dispute
this fact because, while they were aware that BTT was somehow involved in the transportation
of the Equipment, Defendant had not yet revealed the scope of that involvement.  (*Id.*)  For
example, Plaintiffs assert that on October 5, 2007, LaVigne represented that BTT handled the
shipment of both pieces of the Equipment, which discovery revealed to be false.  (*Id.*)
Additionally, Plaintiffs assert that Defendant withheld information from Plaintiffs regarding
other entities' involvement in the Equipment's transportation.  (*Id.*)

Defendant next submits that on June 4, 2008, Plaintiffs were advised again that Defendant would not be making insurance claims and that the insurance claims would have to come directly from Plaintiffs.  (*Id.* at 14.)  Plaintiffs dispute this fact.  They assert that on June 17, 2008, Defendant informed Plaintiffs that it was contacting its insurance company and that it would advise Plaintiffs on the status of the insurance claim.  (*Id.*)

Although this case commenced on September 11, 2009, service of the summons and Complaint was not completed until October 21, 2009.  (*Id.* at 27.)

### Plaintiffs' Alleged Damages

Timothy Chaney ("Chaney") has been a service technician of Okuma America ("Okuma") for twenty-two years, but he has not been designated as an expert under Rule 26.  (*Id.* at 17-18.)  Plaintiffs state that his duties include inspection and repair of Okuma's equipment, and he always prepares a written report after his inspections.  (*Id.*)  Defendant states that Chaney was hired by Plaintiffs to prepare a report after inspecting the Equipment and that the Equipment's potential for repair was based solely on the Okuma report.  (*Id.* at 18, 26.)  Defendant also states that, other than the Okuma report, Plaintiffs did not know whether the Equipment was repairable or whether it had value.  (*Id.* at 26.)

Plaintiffs dispute this fact's characterization because they requested Okuma to inspect the Equipment, and Okuma sent Chaney to conduct the inspection, after which he prepared a report. (*Id.*)  In his report, Plaintiffs point out that Chaney states that "[the Equipment] is no longer usable and should scraped. . . . It could also be very dangerous to try and operate [the Equipment] in this condition."  (*Id.*)  Other than his report, Defendant says that Chaney offered no insight, opinion, or statement to Plaintiffs regarding whether the Equipment was serviceable,

repairable, or damaged in a particular manner.  (*Id.*)  Plaintiffs dispute this statement and assert that Chaney conversed with Kevin Feeney ("Feeney"), who was the product manager for Plaintiffs, and these conversations formed some of the basis for Plaintiffs' determination as to their ability to repair the Equipment.  (*Id.* at 18, 19, 26.)  Whether Feeney was familiar with the terms and conditions used by logistics providers, including FedEx, regarding handling customs clearance, on-forwarding, and making arrangements with trucking companies is in dispute.  (*Id.* at 21.)

The parties do not dispute that Chaney did not know the amount of repair costs or the value of the Equipment.  (*Id.* at 18.)  Nor do they dispute that, other than their claimed $350,000.00 loss, Plaintiffs have not calculated their damages.  (*Id.* at 21.)  However, Defendant asserted that the statements in Chaney's report about the availability of replacement parts for the Equipment were not based on personal knowledge.  (*Id.* at 18.)  Instead, Defendant states that Chaney's knowledge came strictly from communications with Okuma's Japanese advisor, Tom Sakuria.  (*Id.*)

Additionally, the parties do not dispute that Plaintiffs have no evidence, facts, or witnesses to support the assertion that the logistics providers or entities were not reasonably qualified to perform the services for which they were retained or that Defendant failed to provide appropriate instructions to any of the logistics providers or entities for them to perform the services for which they were retained.  (*Id.* at 14.)

Defendants state that, although Plaintiffs were responsible for Defendant's invoices, Plaintiffs did not make arrangements with Defendant and did not provide any instructions as to Defendant's responsibilities regarding the Equipment.  (*Id.* at 20.)  Plaintiffs dispute this fact and

state that Defendant admitted that it received instructions from and made arrangements with Plaintiffs. (*Id.*) Defendant states that it never promised Plaintiffs that it would arrange for and handle the safe and efficient delivery of the Equipment in good condition. (*Id.*) Plaintiffs dispute this fact and assert that Defendant did arrange for and handle the delivery of the Equipment for them. (*Id.*) Furthermore, Defendant asserts that it never falsely represented to Plaintiffs that it would insure the safe carriage of the Equipment from the Port of Philadelphia to Michigan. (*Id.* at 22.) Plaintiffs dispute this fact and point out that Defendant did represent that it would safely transport the Equipment to its destination. (*Id.*)

Defendant says that Plaintiffs did not mitigate their damages other than obtaining a report from Okuma on the potential for the Equipment to be repaired. (*Id.* at 25.) Plaintiffs dispute this fact and say that they tried to sell the damaged Equipment to Okuma, but Okuma did not want to buy it as it was severely damaged with "a lot of bent up parts [and] sheet metal." (*Id.*) Defendant also believes that Plaintiffs relieved Royal Oak of its contractual obligation to purchase the machine. (*Id.*) Plaintiffs dispute this fact and note that they could not enforce their contract with Royal Oak because the Equipment was no longer serviceable. (*Id.* at 26.) According to Plaintiffs, Feeney testified that the contract between Plaintiffs and Royal Oak required that "the piece of [E]quipment . . . be paid for upon arrival in good condition [at Royal Oak's] facility." (*Id.*)

It is undisputed that Plaintiffs undertook no independent investigation into the identity of the entity unloading the Equipment other than asking Defendant for that entity's identity. (*Id.* at 27.)

**Insurance**

21

It is undisputed that Royal Oak did not request insurance for the shipment of the Equipment.  (*Id.* at 19.)  Nor did Plaintiffs request insurance for the Equipment.  (*Id.* at 20.) Defendant submits that it never made statements about the availability of insurance coverage for Plaintiffs.  (*Id.* at 22.)  Plaintiffs dispute this fact.  They assert that Defendant "constantly reassured Plaintiffs throughout their interaction that [Defendant's] insurance carrier would provide coverage for the damage to the Equipment."  (*Id.* at 22-23.)  According to Plaintiffs, Defendant scheduled a survey of the damaged Equipment.  (*Id.* at 23.)  While one of Defendant's representatives did tell Plaintiffs that Defendant had not insured the Equipment, Defendant continued to communicate with Plaintiffs regarding an insurance claim and survey and to provide conflicting information regarding whether the insurance claims had been filed, whether the shipment was covered by insurance, and whether the insurance claims would eventually be settled or resolved.  (*Id.*)

Defendant states that Plaintiffs have no evidence, facts, or witnesses to assert that any of Defendant's conduct regarding a failure to provide documentation or information or assist in the insurance claim process was willful or intentional.  (*Id.* at 15.)  Furthermore, according to Defendant, Plaintiffs are unaware of any facts supporting a claim that Defendant's manifestations and willingness to cooperate were false.  (*Id.* at 24.)  Defendant avers that its only allegedly deceptive conduct regarded whether the Equipment was covered by insurance.  (*Id.* at 25.)

Plaintiffs strenuously dispute these facts.  They cite to numerous portions of the record and assert that Defendant represented that multiple insurance claims had been filed with multiple entities regarding the Equipment's damage.  (*Id.* at 15.)  Plaintiffs assert at length that, after this

case began, Defendant identified no facts in the record indicating that it made Plaintiffs aware that its representations regarding the purchase of insurance were false and that no claim had been filed. (*Id.*) Plaintiffs state that, while Defendant led them to believe that it was contacting all relevant truckers and other transportation companies to seek resolution to the Equipment's damage, "as became clear during discovery, [Defendant] never did so." (*Id.*) Plaintiffs further aver that Defendant knew that they would be unable to contact the companies themselves because Defendant held all the companies' information and resisted Plaintiffs' attempts to acquire the information. (*Id.* at 16.)

According to Defendant, other than waiting for information from Defendant, Plaintiffs did not rely on its advice that an insurance adjuster would be looking into the damaged Equipment and arranging an inspection. (*Id.* at 22.) Defendant also submits that Plaintiffs did not change their position and did not detrimentally rely on any of Defendant's alleged representations regarding insurance. (*Id.* at 24.) Furthermore, Defendant states that Plaintiffs are unaware of any damages suffered by the delay in taking legal action other than storage charges or how the alleged deceptive conduct related to insurance ultimately had a detrimental effect on Plaintiffs' company. (*Id.* at 24-25.) Additionally, Defendant states that if Plaintiffs had been advised of the lack of insurance sooner, they would not have acted differently. (*Id.* at 27.)

Plaintiffs dispute these facts and state that they believed that Defendant would pay or arrange for payment for the Equipment's damage and that Plaintiffs waited, based on Defendant's direction, for Defendant to bring the matter to conclusion. (*Id.* at 22.) Plaintiffs state that they forewent the opportunity to pursue legal action against the other entities involved in the Equipment's shipment, with the result that those claims are now time-barred. (*Id.*)

Additionally, Plaintiffs assert that they did not replace the Equipment while waiting on inspection and disposition by Defendant, resulting in damages due to manufacturing delays caused by the lack of functional equipment. (*Id.*)

Defendant also states that Plaintiffs became aware that the claim for damage to the Equipment would not be resolved to their satisfaction when Defendant advised Plaintiffs that there was no insurance on the Equipment. (*Id.* at 26.) Plaintiffs dispute this fact because, after that incident, Defendant continued to indicate that it would resolve the claim through its insurance company. (*Id.*)

### STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[11] In reviewing a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party.[12] When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but instead must present some "specific facts showing that there is a genuine issue for trial."[13] It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts."[14] These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a

---

[11]     Fed. R. Civ. P. 56(a).

[12]     *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[13]     *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

[14]     *Matsushita*, 475 U.S. at 586.

preponderance of the evidence that the nonmoving party is entitled to a verdict.[15]  When

determining if summary judgment is appropriate, the Court should ask "whether the evidence

presents a sufficient disagreement to require submission to a jury or whether it is so one-side that

one party must prevail as a matter of law."[16]

Summary judgment must be entered "against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial."[17]  In this Circuit, "this requires the nonmoving party

to 'put up or shut up' [on] the critical issues of [his] asserted causes of action."[18]

## ANALYSIS

Defendant's Motion for Summary Judgment raises four primary issues in the following

order: whether Plaintiffs' claims are timely, whether Plaintiffs' TCPA claim is valid, whether

Defendant is liable under the Carmack Amendment, and whether Plaintiffs' promissory estoppel

and detrimental reliance claim is valid.  In their Response, Plaintiffs' organization of their

arguments mirrors that of Defendant's Motion.

However, upon due consideration of the issues raised and briefed by the parties, the

Court finds that the issues raised by Defendant can be more expeditiously addressed if they are

taken in a somewhat different order.  Additionally, the parties do not dispute that Tennessee law

---

[15]    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

[16]    *Id.* at 251-52.

[17]    *Celotex*, 477 U.S. at 322.

[18]    *Lord v. Saratoga Capital, Inc.*, 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing
*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989)).

governs the state law claims of this action; therefore, the Court will apply Tennessee law to Plaintiffs' state law claims.[19]

## Applicability of the Terms and Conditions

Defendant argues that Plaintiffs are bound to its Terms and Conditions, which contain a modified statute of limitations requiring Plaintiffs to file and perfect service of the Complaint within two years of injury.  If the Terms and Conditions apply to Plaintiffs and are not void as against public policy, Plaintiffs' service of the Complaint outside the two-year period delineated in the sue-and-serve provision would be outside the applicable statute of limitations in the Terms and Conditions.  Defendant appears to present two theories by which the Terms and Conditions apply to Plaintiffs: (1) the relationship between Plaintiffs and Defendant as created by the parties' dealings, the course of performance, and oral and written communications ("the direct relationship") or (2) the alleged agency relationship ("the agency relationship") between Plaintiffs and Royal Oak.

### The Direct Relationship

Tennessee's normal statute of limitations for actions sounding in contract is six years.[20]  However, that statute of limitations may be altered by contractual agreement.[21]  In this case, the Terms and Conditions contain such an altered contractual limitations period, requiring claims to be brought and served within two years from the date of the damage.  Therefore, pursuant to

---

[19]     *See Wilkes Assocs. v. Hollander Indus. Corp.*, 144 F. Supp. 2d 944, 949 n.4 (S.D. Ohio 2001) (quoting *ECHO Inc. v. Whitson Co., Inc.*, 52 F.3d 702, 707 (7th Cir. 1995)).

[20]     Tenn. Code Ann. § 28-3-109(a)(3).

[21]     *See id.* (noting that contractual causes of action must be commenced within six years after accrual of the cause of action in "[a]ctions on contracts not otherwise expressly provided for").

Tenn. Code Ann. § 28-3-109(a)(3), this provision validly alters the statute of limitations for suits arising under the Terms and Conditions in this case.

Additionally, "[t]he authority 'of the courts to invalidate the bargains of parties on grounds of public policy is unquestioned and is clearly necessary.'"[22] Although "Tennessee courts have long recognized and exercised this authority," they must do so "with great delicacy."[23] This need for delicacy arises due to the tension between freedom of contract on one hand and "the preservation of the public health, safety, morals, or general welfare" on the other.[24] In the exercise of appropriate judicial restraint, courts will decline to enforce a contractual provision on public policy grounds only

> (1) when the violation of public policy is clearly established, (2) when the violation is inherent in the contract itself, not collateral thereto, or when the contract's purpose taints it with illegality, and (3) when a clear public detriment will probably occur as a result of the contract or where the object of the contract tends to injure the public.[25]

In assessing Tennessee's public policy position on a certain area, "courts look to the Constitution of Tennessee, the statutes enacted by the General Assembly, the common law, and prior court decisions."[26]

---

[22]    *Baugh v. Novak*, 340 S.W.3d 372, 382 (W.D. Tenn. 2011) (quotation omitted).

[23]    *Id.* Indeed, the Tennessee Supreme Court has cautioned that Tennessee's courts must "wield a scalpel rather than a sledgehammer" when determining whether public policy imposes limitations on freedom of contract. *Id.* at 384.

[24]    *Id.* at 382-83.

[25]    *Id.* at 383-84.

[26]    *Id.* at 384.

Defendant argues that the Terms and Conditions contain a Limitation of Actions provision providing that all suits against Defendant must be timely filed and properly served within two years from the date of the loss from the damage.[27]  Although Defendant concedes that the suit was timely filed within two years, Defendant asserts that it was not properly served until October of 2009—one month too late.[28]  Therefore, Defendant submits that the Terms and Conditions apply to Plaintiffs and that their claims are barred by this two-year Limitation of Actions provision.[29]

In response, Plaintiffs assert that their Carmack Amendment and negligence claims are not barred by the Terms and Conditions for three reasons.  First, they argue that the Terms and Conditions do not govern Defendant's obligations in the relationship between Plaintiffs and Defendant.[30]  Second, if the Terms and Conditions apply, Plaintiffs aver that the limitations period does not apply to any liability Defendant has under the Carmack Amendment.[31]  Finally, Plaintiffs submit that the Terms and Conditions' limitations period violates Tennessee's public policy for when an action is deemed to be commenced.[32]

In reply, Defendant asserts that if the Terms and Conditions apply and are enforceable, Defendant argues that all of Plaintiffs' claims are time-barred regardless of whether they sound

---

[27]    (Def.'s Mot. for Summ. J., D.E. # 38-1, at 12.)

[28]    (*Id.* at 12-13.)

[29]    (*Id.* at 13.)

[30]    (Pls.' Resp. to Def.'s Mot. for Summ. J., D.E. # 56, at 9-13.)

[31]    (*Id.* at 13-15.)

[32]    (*Id.* at 16-18.)

in tort or contract.[33]  Defendant further avers that "because the Terms and Conditions . . . delineate that [Defendant] only agreed to make arrangements, not assume responsibility for the safe transport" of the Equipment, Plaintiffs cannot pigeonhole their claims under the Carmack Amendment.  Regarding Plaintiffs' argument that the Terms and Conditions are void as against Tennessee's public policy, Defendant states that if Plaintiffs' argument was true, "no contract could ever vary the statute of limitations in Tennessee because the statute would always be different than the contract term."[34]

The Court finds that issues of fact remain as to whether the Terms and Conditions apply to the direct relationship between Plaintiffs and Defendant.  Due to the extent of the facts disputed by Plaintiffs, it is unclear to the Court which terms and conditions were provided to Plaintiffs.  It is also unclear whether the terms and conditions ultimately applicable to the relationship between Plaintiffs and Defendant contained a limitations period or additional applicable provisions, and if so, what those periods or provisions are.  Because both the facts necessary to decide which terms and conditions govern the direct relationship between Plaintiffs and Defendant and the contents of those terms and conditions remain in dispute, summary judgment is inappropriate.  Therefore, Defendant's Motion for Summary Judgment as to the applicability of the Terms and Conditions directly between Plaintiffs and Defendant is **DENIED**.

The Agency Relationship

---

[33]      (Def.'s Reply to Pls.' Resp., D.E. # 61, at 7.)

[34]      (*Id.* at 8.)

Because the applicability of the Terms and Conditions to Plaintiffs turns in part upon the relationship between Royal Oak and Plaintiffs, the Court must determine whether Plaintiffs and Royal Oak had a principal-agent relationship.

Tennessee courts have noted that "a power of attorney establishes an agency relationship by agreement."[35]  However, that agency relationship will exist only between the parties to the power of attorney.  Additionally, "[t]he creation of an agency relationship does not require a contract, an explicit agreement, or an understanding between the parties."[36]  Normally, "the existence of an agency relationship is a question of fact under the circumstances of the particular case . . . and is determined by examination of agreements among the parties or of the parties' actions."[37]  Relevant factors in determining the existence of an agency relationship include the principal's right to control the acts of the agent in the area of the agent's means and method of work,[38] who first set the agency in motion, and whose interest the agent protects.[39]  The amount of actual control exercised by the principal over the agent may also be determinative of whether an agency relationship exists.[40]

---

[35]   *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 297 n.1 (Tenn. Ct. App. 2001).

[36]   *White v. Revco Disc. Drug Ctrs., Inc.*, 33 S.W.3d 713, 724 (Tenn. 2000).

[37]   *Johnson v. LeBonheur Children's Med. Ctr.*, 74 S.W.3d 338, 343 (Tenn. 2002) (internal quotation and punctuation omitted).

[38]   *Id.*; *Davis v. Univ. Physicians Found. Inc.*, No. 02A01-9812-CV-00346, 1999 WL 643388, at *4 (Tenn. Ct. App. Aug. 24, 1999).

[39]   *Roberts v. Iddins*, 797 S.W.2d 615, 617 (Tenn. Ct. App. 1990).

[40]   *Johnson*, 74 S.W.3d at 343.

Where an agency relationship exists, the principal may be bound by the acts of the agent performed on the principal's behalf and within the actual or apparent scope of authority.[41] However, a principal may still be bound by its agent's acts which are beyond the scope of her actual or apparent authority through ratification.[42]  "Ratification is the express or implied adoption and confirmation by one person of an act or contract performed or entered into on his behalf or by another who assumed to act as his agent without authority so to do."[43]  Ratification is usually a question of the principal's intent, which is generally regarded as a question of fact inappropriate for resolution at summary judgment.[44]

Defendant states that "Royal Oak was designated under the commercial documents[45] as the consignee, owner, and real party in interest pursuant to customs documentation and CFR designation" and that "[Royal Oak] was the only party with an established relationship with

---

[41]     *Id.* at 344.

[42]     *Bells Banking Co. v. Jackson Ctr., Inc.*, 938 S.W.2d 421, 424-25 (Tenn. Ct. App. 1996).

[43]     *Gay v. City of Somerville*, 878 S.W.2d 124, 127 (Tenn. Ct. App. 1994).  An agency relationship is only created at the will and by the act of the principal.  Its existence is a fact to be proved by tracing it to some act of the alleged principal, and whether the agency relationship exists turns on facts concerning the understanding between the alleged principal and agent.  *Weaver v. Deverell*, No. W2011-00563-COA-R3-CV, 2011 WL 5069418, at *7 (Tenn. Ct. App. Oct. 26, 2011).

[44]     *Harber v. Leader Fed. Bank for Sav.*, 159 S.W.3d 545, 552 (Tenn. Ct. App. 2004).

[45]     Defendant references commercial documents, presumably contractual documents between itself and Royal Oak or between Royal Oak and Plaintiffs.  However, the Court cannot locate either of these documents in the record of this case, and Defendant did not direct the Court's attention to any specific documents.

[Defendant] and, indeed, the only party which retained [Defendant]."[46]  Accordingly, "Plaintiffs must take their claims subject to the arrangements made by their agent, Royal Oak, or they have no claims."[47]

In response, Plaintiffs state that "it is undisputed that Royal Oak was the ultimate purchaser of the Equipment, not the agent of Plaintiffs that could bind Plaintiffs in any way."[48] Additionally, Plaintiffs aver that "[a]ny attempt by [Defendant] to argue that its prior course of dealing with Royal Oak imposes the [T]erms and [C]onditions upon Plaintiffs is without merit."[49]  In support of this statement, Plaintiffs refer to their arguments regarding the Terms and Conditions' inapplicability to them.[50]  Therefore, Plaintiffs reiterate that questions of fact exist as to which terms and conditions Defendants supplied and the contents of those terms and conditions.[51]  Additionally, Plaintiffs point out that

> Plaintiffs do not claim to be subrogated to Royal Oak; instead, Plaintiffs and [Defendant] entered into an independent transaction that was separate and apart from any pre-existing relationship Defendant had with Royal Oak.  Royal Oak was not the agent for Plaintiffs in this transaction—Royal Oak was simply the first entity in contact with [Defendant], after which Royal Oak directed [Defendant] to contact Plaintiffs because Royal Oak had no responsibility regarding the transportation of the Equipment. . . . At all relevant times, [Defendant's] customers in this transaction were Plaintiffs, and the terms of any

---

[46]     (*Id.* at 24.)

[47]     (Def.'s Mot. for Summ. J., D.E. # 38-1, at 24.)

[48]     (Pls.' Resp. to Def.'s Mot. for Summ. J., D.E. # 56, at 27.)

[49]     (*Id.* at 27-28.)

[50]     (*Id.* at 9-13.)

[51]     (*Id.* at 9-10.)

agreement that [Defendant] may have had with any other entity are wholly irrelevant.[52]

In reply, Defendant points out that "Plaintiffs do not dispute the validity of the power of attorney which was executed by Royal Oak and which acknowledged receipt of the Terms and Conditions and their application to all services undertaken by [Defendant]."[53]  Defendant argues that "Plaintiffs cannot now attempt to dispute that [Defendant] was indeed hired by Royal Oak and that they were subject to the terms of the agreement between [Defendant] and Royal Oak."[54] Furthermore, Defendant states that even if it is liable for any loss, its losses are limited to $50.00 by the Terms and Conditions.[55]

The Court finds that questions of fact remain as to the type of relationship between Royal Oak and Plaintiffs.  Although the parties do not dispute the validity of the Terms and Conditions or the power of attorney between Royal Oak and Defendant, Plaintiffs are not a party to the power of attorney.  Thus, the mere existence of the power of attorney between Royal Oak and Defendant is insufficient to render the Terms and Conditions applicable to Plaintiffs.  The parties dispute whether Royal Oak acted as Plaintiffs' agent—if Royal Oak is ultimately cast as agent to Plaintiffs' principal; indeed, trial could reveal the situation to be the reverse—and many of the facts and their attendant characterizations and implications are in dispute.  Although the facts regarding agency are heavily disputed, the Court notes that most of the disputed facts do not indicate an understanding of an agency relationship between Plaintiffs and Royal Oak.  Nor do

---

[52]     (*Id.* at 12-13.)

[53]     (Def.'s Reply to Pls.' Resp., D.E. # 61, at 9.)

[54]     (*Id.*)

[55]     (*Id.*)

they demonstrate that Plaintiffs exercised control over Royal Oak—or that Royal Oak exercised control over Plaintiffs.

Accordingly, while it appears undisputed that the Terms and Conditions were binding as between Royal Oak and Defendant, whether those same Terms and Conditions could be extended from Royal Oak to Plaintiffs through agency cannot be determined at this time, and summary judgment is inappropriate.  Therefore, the Court need not reach the issue of whether the two-year serve-and-sue provision is void as against Tennessee's public policy.

Therefore, Defendant's Motion for Summary Judgment as to the applicability of the Terms and Conditions is **DENIED**.

## Carmack Amendment Applicability and Liability

If the Terms and Conditions are found not to apply to Plaintiffs or the Terms and Conditions apply but the two-year sue-and-serve provision is void as against Tennessee's public policy, the next issue before the Court is the applicability of the Carmack Amendment.

Due to the Carmack Amendment's "complete and detailed" regulation of interstate commerce carriers, state common law suits against interstate commercial carriers of property have been preempted.[56]  The Eastern District of Michigan, citing to cases from the First and Eighth Circuits, noted that this preemption extends to common law tort claims as well as breach of contract claims.[57]  The Eastern District of Tennessee has recognized that the Carmack

---

[56]      *W.D. Lawson & Co. v. Penn Cent. Co.*, 456 F.2d 419, 421 (6th Cir. 1972) (holding the plaintiff's state law breach of contract suits preempted by the Carmack Amendment).

[57]      *Delta Research Corp. v. EMS, Inc.*, No. 04-60046, 2005 WL 2090890, at *7 (E.D. Mich. 2005).

Amendment also preempts state statutory claims.[58]  Therefore, Plaintiffs' TCPA, negligence, and promissory estoppel claims survive only if Defendant is not covered by the Carmack Amendment.

Plaintiffs have sued under the Carmack Amendment, which serves to "relieve shippers of the burden of searching out a particular negligent carrier from among the often numerous carriers handling an interstate shipment of goods."[59]  The Carmack Amendment allows common carriers to be held liable for damage they cause to property received for transportation.[60]  Under the Carmack Amendment, "in an action to recover from a carrier for damage to a shipment, the shipper establishes his prima facie case when he shows delivery in good condition, arrival in damaged condition, and the amount of damages."[61]  Once a plaintiff establishes a prima case against a common carrier, the burden of proof shifts to "the carrier to show both that it was free from negligence and that the damage to the cargo was due to one of the excepted causes relieving carrier liability."[62]

---

[58]   *Malone v. Mayflower Transit, Inc.*, 819 F. Supp. 724, 725 (E.D. Tenn. 1993) (holding that the Carmack Amendment preempted state common law theories of liability in negligence, bailment, TCPA, and Tennessee statutory bad faith penalty provisions).

[59]   *Reider v. Thompson*, 339 U.S. 113, 119 (1950).  Indeed, the Carmack Amendment was meant "to create in the initial carrier unity of responsibility for the transportation [of goods] to [their] destination."  *Mexican Light & Power Co. v. Tex. Mexican Ry. Co.*, 331 U.S. 731, 734 (1947).

[60]   *Plough, Inc. v. Mason & Dixon Lines*, 630 F.2d 468, 470 (6th Cir. 1980).

[61]   *Mo. Pac. R. Co. v. Elmore & Stahl*, 377 U.S. 134, 138 (1964).

[62]   *Id.*  Five "excepted causes" relieve a carrier from liability in the absence of its own negligence, namely: "(a) an act of God; (b) the public enemy; (c) the act of the shipper itself; (d) public authority; or (e) the inherent vice or nature of the goods."  *Id.*

Several definitions are relevant to the Court's interpretation of Plaintiffs' Carmack Amendment claim. A "broker" is "a person, other than a motor carrier or an employee or agent of a motor carrier, that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier for compensation."[63] A "carrier" is "a motor carrier, a water carrier, and a freight forwarder."[64] A "freight forwarder" is

> a person holding itself out to the general public (other than as a . . . motor . . . carrier) to provide transportation of property for compensation and in the ordinary course of its business assembles and consolidates, or provides for assembling and consolidating, shipments and performs or provides for break-bulk and distribution operations of the shipments; assumes responsibility for the transportation from the place of receipt to the place of destination; and uses for any part of the transportation a carrier subject to jurisdiction under [the Carmack Amendment].[65]

A "motor carrier" is "a person providing motor vehicle transportation for compensation."[66] Notably, "motor carriers . . . are not brokers within the meaning of [the Carmack Amendment] when they arrange or offer to arrange the transportation of shipments which they are authorized to transport and which they have accepted and legally bound themselves to transport."[67] A

---

[63]    49 U.S.C. § 13102(2).

[64]    *Id.* § 13102(3).

[65]    *Id.* § 13102(8).  The Supreme Court has noted that "[f]orwarders utilize common carriers by rail and motor truck to transport goods owned by others. . . . [They] may use the service of carriers to assemble shipments of less than truck-load or carload lots at their concentration center, to transport the assembled truck-load or carloads to a distribution center, and to carry the broken up small shipments beyond their break-bulk distribution center." *United States v. Chicago Heights Trucking Co.*, 310 U.S. 344, 345-46 (1940).

[66]    49 U.S.C. § 13102(15).

[67]    49 C.F.R. § 371.2(a).

36

"'person' . . . includes a trustee, receiver, assignee, or personal representative of a person"[68] as well as "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals."[69]  Additionally,

> "transportation" includes a motor vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, regardless of ownership or an agreement concerning use; and services related to that movement, including arranging for, receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, packing, unpacking, and interchange of passengers and property.[70]

With these definitions in mind, the Court will now turn to the substantive law of Defendant's Motion on Plaintiffs' claims.

The Carriage of Goods by Sea Act ("COGSA") and the Carmack Amendment "cannot apply in concert" due to their different liability schemes and different limitations on liability.[71] Therefore, the Court must determine whether Defendant is covered by COGSA or the Carmack Amendment.  The Carmack Amendment applies to "'transportation by motor carrier and the procurement of that transportation  . . . between a place in a State and place in another State or . . . . [a place in] the United States and a place in a foreign country to the extent the transportation is in the United States."[72]  COGSA applies to "a carrier engaged in the carriage of goods to or from

---

[68]    49 U.S.C. § 13102(18).

[69]    1 U.S.C. § 1.  Therefore, it is undisputed that Defendant is a "person" under the Carmack Amendment.

[70]    49 U.S.C. § 13102(23).

[71]    *Custom Rubber Corp. v. ATS Specialized, Inc.*, 633 F. Supp. 2d 495, 503 (N.D. Ohio 2009) (citing *Am. Road Serv. Co. v. Consol. Rail Corp.*, 348 F.3d 565 (6th Cir. 2003)).

[72]    49 U.S.C. § 13501(1)(E).

any port in the United States."[73]  A COGSA "carrier" is defined as the "owner, manager,

charterer, agent, or master of a vessel."[74]  Here, Defendant is not a carrier as defined by COGSA,

as it does not fit within the statutory definition of a COGSA carrier.  Therefore, the Court finds

that if Defendant is liable as a carrier or a freight forwarder, it will be liable under the Carmack

Amendment rather than COGSA.

      The Carmack Amendment's General Liability provision provides the following as to

motor carriers and freight forwarders:

> A carrier providing transportation or service . . .  shall issue a receipt or bill of
> lading for property it receives for transportation under this part.  That carrier and
> any other carrier that delivers the property and is providing transportation or
> service . . . are liable to the person entitled to recover under the receipt or bill of
> lading.  The liability imposed under this paragraph is for the actual loss or injury
> to the property caused by (A) the receiving carrier [or] (B) the delivering carrier .
> . . . Failure to issue a receipt or bill of lading does not affect the liability of the
> carrier.  A delivering carrier is deemed to be the carrier performing the line-haul
> transportation nearest the destination but does not include a carrier providing only
> a switching service at the destination.[75]

Motor carriers are liable for the actual loss of or damage to freight they carry.[76]  Regarding

freight forwarders' general liability,

> [a] freight forwarder is both the receiving and delivering carrier.  When a freight
> forwarder provides service and uses a motor carrier providing transportation . . .
> to receive property from a consignor,[77] the motor carrier may execute the bill of

---

[73]     46 U.S.C. § 30702(a).

[74]     *Id.* § 30701.

[75]     49 U.S.C. § 14706(a)(1).

[76]     *See id.*

[77]     A consignor is "one who dispatches goods to another on consignment," which
entails transferring goods to another's custody or charge or giving goods to a carrier for delivery
to a designated recipient.  Black's Law Dictionary 303 (7th ed. 1999).

lading or shipping receipt for the freight forwarder with its consent.  With the consent of the freight forwarder, a motor carrier may deliver property for a freight forwarder on the freight forwarder's bill of lading, freight bill, or shipping receipt to the consignee named in it, and receipt for the property may be made on the freight forwarder's delivery receipt.[78]

The Carmack Amendment contains a provision limiting motor carriers' liability:

A carrier providing transportation or service . . . may establish rates for the transportation of property . . . under which the liability of the carrier for such property is limited to a value established by written or electronic declaration of the shipper or by written agreement between the shipper if that value would be reasonable under the circumstances surrounding the transportation.[79]

Additionally, to limit their liability to an amount less than the actual value of the lost or damaged goods, the Carmack Amendment requires only that the carrier provide to the shipper upon request "a written or electronic copy of the rate, classification, rules, and practices upon which any rate applicable to the shipment, or agreed to between the shipper and the carrier[,] is based."[80]  Additionally, under the latter provision, "the shipper is responsible for determining the conditions imposed on the transportation of the shipment."[81]  The statutory language, in addition to the title of the subsection, denotes that freight forwarders do not enjoy these same limitations of liability.[82]

---

[78]     49 U.S.C. § 14706(a)(2).

[79]     *Id.* § 14706(c)(1)(A).

[80]     *Id.* § 14706(c)(1)(B).

[81]     *EFS Nat'l Bank v. Averitt Exp., Inc.*, 164 F. Supp. 2d 994, 1000 (W.D. Tenn. 2001).

[82]     *See* 49 U.S.C. § 14706(c)(1).

The Carmack Amendment applies to motor carriers and freight forwarders, but not brokers.[83]  However, whether a person is a carrier, forwarder, or a broker is "often blurry."[84]  Courts determine an entity's status as a carrier under the Carmack Amendment "according to the services [it offers], rather than by its corporate character or declared purpose."[85]  Courts look at whether the party holds itself out to the public generally as the actual transporter of goods as well as the services the party provides under its contract.[86]  Whether an entity is a regulated interstate motor carrier is not dispositive of the issue of liability under the Carmack Amendment, and how the entity labels itself is not controlling.[87]

Defendant argues that it did not agree to act as a Non-vessel Operation Common Carrier under COGSA or a freight forwarder or common carrier under the Carmack Amendment and that, by extension, it did not assume responsibility for the safe transportation of the Equipment.[88]  Defendant further states that Plaintiffs cannot escape the Terms and Conditions by suing under a negligence theory in tort.[89]  Additionally, Defendant asserts that if it is liable, its liability under the Terms and Conditions would be limited to $50.00.[90]

---

[83]     *See id.* § 14706(a).

[84]     *Delta Research Corp.*, 2005 WL 2090890, at *5.

[85]     *Id.*

[86]     *Id.*

[87]     *Delta Research Corp. v. EMS, Inc.*, No. 04-60046, 2006 WL 1042048, at *2-3 (E.D. Mich. 2006).

[88]     (Def.'s Mot. for Summ. J., D.E. # 38-1, at 19.)

[89]     (*Id.* at 23.)

[90]     (*Id.* at 25.)

In response, Plaintiffs argue that the primary issue before the Court regarding their Carmack claim is whether Defendant was acting as a carrier or a broker when it arranged for the shipment of the Equipment.[91]  Because this inquiry is "inherently fact-intensive," Plaintiffs submit that questions of fact exist as to whether Defendant qualifies as a motor carrier or a freight forwarder under the Carmack Amendment.[92]

In reply, Defendant points out that "Plaintiffs have no competent or admissible evidence to dispute [Defendant's] version of events [as they have not] obtained . . . affidavit or deposition testimony from Royal Oak to dispute [Defendant's] assertions that it undertook only to make arrangements for the transport of the cargo and not the actual transport itself."[93]  Defendant relies on the Terms and Conditions to argue that it "was responsible only for exercising reasonable care in the selection of third parties[,] that it would not be responsible for loss or damage occurring while the goods were in the possession of third parties," and that it disclaimed any intent to assume responsibility as a carrier or a Carmack freight forwarder.[94]  Additionally, Defendant asserts that it is entitled to summary judgment because "there is a written contract agreed to by both [Defendant] and the party which hired [Defendant, Royal Oak,] that

---

[91]     (Pls.' Resp. to Def.'s Mot. for Summ. J., D.E. # 56, at 22.)

[92]     (*Id.* at 23-28.)

[93]     (Def.'s Reply to Pls.' Resp., D.E. # 61, at 10.)  This argument ignores the fact that Defendant could be liable under the Carmack Amendment as a freight forwarder regardless of whether it actually transported the Equipment.

[94]     (*Id.*)

establishes that [Defendant] did not undertake to assume responsibility for the safe transport of the cargo."[95]

Plaintiffs provided two invoices with their Amended Complaint.[96]  While both invoices are difficult to read, the first included charges for handling, customs exam charges, outport clearance charges, and storage charges.  The second included warehouse charges, per diem charges, delivery charges involving cranes, flat beds, and permits, removal of a tarp, return of empties to rail, and weight verification.  Both invoices contain statements saying that "all business transactions are provided subject to our terms and conditions of service . . . available on request."  In this same general area, the invoice says that "business is undertaken subject to the terms and conditions on [the] reverse side.  Please read carefully."  However, the reverse sides of the invoices were not presented to the Court, presumably because the invoices did not contain them.

The Court finds that the facts necessary to determine whether Defendant is a freight forwarder, motor carrier, or broker under the Carmack Amendment either remain in dispute or there is insufficient evidence before the Court upon which it can base its decision..  Given the fact-intensive nature of the inquiry into coverage under the Carmack Amendment, determining into which Carmack category Defendant fits is inappropriate at this time.  Accordingly,

---

[95]     (*Id.* at 11.)  Furthermore, Defendant points out that only it and Royal Oak are legally competent to establish the contents of their agreement.  Royal Oak has remained silent, and Defendant has established the parameters of the tasks it was hired to complete.  Therefore, Defendant argues that Plaintiffs "can point to nothing in the record to establish that [Defendant] agreed to assume responsibility for the safe transport of the cargo."  (*Id.*)  But the responsibilities agreed to by Defendant are irrelevant to the services it rendered, how it held itself out to the public, and how it labeled itself.

[96]     (D.E. # 9-1.)

Defendant's Motion for Summary Judgment as to Plaintiffs' Carmack Amendment claim is **DENIED**.

As the Court has found that issues of fact remain as to whether the Defendant is covered by the Carmack Amendment, the Court need not reach the remaining issues raised by Defendant in its Motion for Summary Judgment.  However, the Court notes that if, at trial, the Carmack Amendment is found to apply to Defendant, the Carmack Amendment will preempt Plaintiffs' remaining TCPA, negligence, and promissory estoppel claims.  If Defendant is found to be a broker, rendering the Carmack Amendment inapplicable to it, Plaintiffs' remaining claims will include the TCPA , negligence, and promissory estoppel.

As such, the issue of whether the TCPA's one year statute of limitations is subject to equitable tolling in this case will be before the Court only if the Carmack Amendment does not apply to Defendant.  The Court expresses no opinion as to Plaintiffs' equitable estoppel argument at this time.  Similarly, the applicability of the economic loss rule to Plaintiffs' negligence claim will be before the Court only if the Carmack Amendment does not apply to Defendant.  The Court expresses no opinion as to Defendant's assertion of the economic loss rule at this time.

<u>**CONCLUSION**</u>

For the foregoing reasons, Defendant's Motion for Summary Judgment is **DENIED** and Plaintiffs' Motion to Disregard Affidavit Testimony is **GRANTED IN PART AND DENIED IN PART**.

**IT IS SO ORDERED.**

43

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE


Date: January 20th, 2012.